**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **DAMEON R. FUSILIER AND KAYLA LYNN FUSILIER, Individually, and on Behalf of her Minor Children, D. DESHOTEL AND H. FUSILIER, AND RYAN S. BENOIT** | * | **CIVIL ACTION NO. 2:17-cv-1212** |
| **VERSUS** | * | **JUDGE:** |
| **LIEUTENANT ELIZABETH ZAUNBRECHER, DETECTIVE C. MICHAEL TROSCLAIR, SERGEANT JEROD ABSHIRE, AND DEPUTY AARON SHELTON, who were, at all relevant times, Calcasieu Parish Sheriff's Deputies, In their Individual Capacities, SHERIFF OF CALCASIEU PARISH TONY MANCUSO, In his Official Capacity, AND ABC INSURANCE CO.** | * | **MAGISTRATE JUDGE:** |
| | * | **JURY TRIAL DEMANDED** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>CIVIL RIGHTS COMPLAINT</u>

NOW INTO COURT, through undersigned counsel, come DAMEON R. FUSILIER ("Mr. Fusilier"), a person of the full age of majority and domiciled in Calcasieu Parish, Louisiana, and his wife, KAYLA LYNN FUSILIER ("Mrs. Fusilier"), a person of the full age of majority and domiciled in Calcasieu Parish, Louisiana, individually, and on behalf of her minor children, D. DESHOTEL and H.

1

FUSILIER, and RYAN S. BENOIT, a person of the full age of majority and domiciled in Calcasieu Parish, Louisiana, who, with respect, represent:

## JURISDICTIONAL STATEMENT

1.      This action arises under Title 42 U.S.C. §§ 1983 and 1988 and the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States of America with claims for unlawful seizure, malicious prosecution, and denial of bail. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

2.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 including, but not limited to, false arrest, false imprisonment, battery, defamation, malicious prosecution, denial of bail, and loss of consortium (for Mrs. Fusilier, individually, and on behalf of her minor children, D. DESHOTEL and H. FUSILIER, and for RYAN S. BENOIT), all pursuant to Louisiana Civil Code Articles 2315, 2316, and 2320, and Article I §§ 2, 3, 5, 7, and 18, of the Louisiana Constitution of 1974.

3.      This Court has personal jurisdiction over all Defendants, because they are all citizens of Louisiana.  Plaintiffs, therefore, voluntarily submit to the jurisdiction of this Court.

## DEFENDANTS

Made Defendants herein are as follows:

4.    TONY MANCUSO, in his official capacity as the Sheriff of Calcasieu Parish, Louisiana ("Mancuso"), a person of the full age of majority who was, at all times material hereto, the Sheriff of Calcasieu Parish, Louisiana, and, as such, responsible for the hiring, retention, training, and supervision of all of his employees, including Calcasieu Parish LIEUTENANT ELIZABETH ZAUNBRECHER ("Zaunbrecher"), DETECTIVE C. MICHAEL TROSCLAIR ("Trosclair"), SERGEANT JEROD ABSHIRE ("Abshire"), and DEPUTY AARON SHELTON ("Shelton").

5.    Zaunbrecher, Trosclair, Abshire, and Shelton are persons of the full age of majority who were, at all times material hereto, employed by Mancuso and acting in the course and scope of their employment with Mancuso and with the express and implied consent of Mancuso.

6.    ABC INSURANCE CO., upon information and belief, issued a policy of insurance to Mancuso and/or the Calcasieu Parish Sheriff's Office ("CPSO"), which policy provides insurance coverage for the acts alleged herein.

7.    At all times relevant hereto, each of the acts of all of these Defendants were under the color of authority of statutes, ordinances, regulations, customs, and usages of the State of Louisiana.

3

## BACKGROUND

8.     Mr. Fusilier (DOB: 08/06/83) is a disabled American Marine who, just after turning 18 and in the wake of 9/11, signed up to be a Marine in order to protect his country, as a result of which he was an on-the-ground infantryman in the United States Marine Corps from July 2002 until November 2009, during which time he rose from the rank of Private to the rank of Sergeant and was a team leader, and participated in many combat patrols to seek and destroy the enemy during his two deployments to Iraq and one deployment to Afghanistan in which many people were killed, injured, and maimed, many of the enemy tried to kill Mr. Fusilier, Mr. Fusilier killed many of the enemy; at a young age, Mr. Fusilier saw and did things that no person that age should ever have to experience.  Mr. Fusilier lost people who were like a brother to him.  One such brother was killed right next to Mr. Fusilier while Mr. Fusilier was getting shot at also.  To this day, Mr. Fusilier can barely talk about these events, and he still has nightmares about them.  As a result of his Post-Traumatic Stress Disorder ("PTSD"), in addition to physical injuries and other physical medical issues as a result of his combat duties, prior to January 7, 2016, Mr. Fusilier had a V.A. service-connected disability rating of 80%.  Because of the events of January 7, 2016, and the sequelae thereto, Mr. Fusilier's V.A. disability rating is 100% for which he has received and continues to receive medical treatment. In addition to his primary military occupation specialty ("MOS"), which is a combat

infantryman, Mr. Fusilier was a combat marksmanship coach, with the MOS of Combat Marksmanship Trainer, who trained Marines and sailors how to effectively and accurately shoot the M16 and M9 service pistol.  Mr. Fusilier had two enlistments, the first of which was at Camp Lejeune, North Carolina, with 2nd Battalion 6th Marines Echo Company, and, during his second enlistment, he was stationed at Quantico, Virginia, with the Weapons Training Battalion.  Because of his injuries, Mr. Fusilier was honorably discharged from the Marine Corps in November 2009.

9.    Upon his return to civilian life, and notwithstanding his service-connected disabilities, because of Mr. Fusilier's vast knowledge of handguns and the use thereof, he was able to obtain employment at Inner Parish Security Corporation doing armed security work at various commercial and construction locations where he worked his way up to management, in addition to becoming an NRA certified instructor which allowed him to train Inner Parish Security Corporation employees to properly use handguns as part of their jobs.

10.    Mr. Fusilier is originally from Eunice, LA, moved to Iowa, LA, in 1989, and graduated from DeRidder High School in 2002, after which he went into the United States Marine Corps.  While in high school, Mr. Fusilier played football and was in FFA for a couple of years.  In April 2003, he married the love of his life, Kayla Lynn, who had graduated from Lake Arthur High School in 1998 and then moved to Iowa,

LA.  At the time they got married, Mrs. Fusilier already had two sons, D. Deshotel and Ryan S. Benoit, and then she and Mr. Fusilier had their son, H. Fusilier.  In spite of Mr. Fusilier's mental and physical injuries and medical treatment therefor, up until the afternoon of Thursday, January 7, 2016, Mr. Fusilier's life was as good as it could be, and he, Mrs. Fusilier, and their children were happy.  Through lots of therapy and medication, Mr. Fusilier was able to cope the best he could with everyday life, and, upon entering civilian life again, he finally found the job he liked and at which he was good. Mr. Fusilier loved his job; he worked countless hours and devoted himself to his company. Mr. Fusilier still had medical issues that were taking a toll on him with no answers to the cause.  Multiple ER and doctor's visits later, Mr. Fusilier had his gallbladder removed on December 26, 2015.  Mr. Fusilier went through a painful recovery but was finally starting to feel good again, although Mr. Fusilier had extreme gastrointestinal issues after his surgery and was going through a lot of Gatorade to replenish electrolytes.  Mr. Fusilier was given a much-needed pay raise the first week in January 2016, and his boss picked him up to look around Lake Charles for a brand new office for Mr. Fusilier to manage.  Things were looking up. The Fusilier family were starting to be able to pay off bills and were planning to get their oldest son a car with their income tax return.  All of that changed the afternoon of January 7, 2016, when, for the first time in his life, Mr. Fusilier was falsely arrested, accused of crimes he did not commit, denied bail, and kept in jail

for 29 days, as a result of which he lost his job and was evicted from his home, had to hire an attorney to defend himself, and on September 22nd and 23rd, 2016, stood trial before a jury in the District Court in Calcasieu Parish, LA, and, after hearing all of the evidence and deliberating for **only 27 minutes**, the jury returned a verdict of not guilty, because, clearly, Mr. Fusilier was not guilty.

**11.**     Shortly after noon on Thursday, January 7, 2016, Mr. Fusilier was driving his pickup truck enroute to his home after purchasing some Gatorade, and while driving down Amoco Road towards the T intersection of Amoco Road and Nick Martone Road, which roads are located southwest of Iowa, LA, in Calcasieu Parish, with Nick Martone Road, a two-lane, black-top, marked highway, being the primary highway and protected by a stop sign at that T intersection, Mr. Fusilier observed a white SUV in front of him roll through the stop sign without coming to a complete stop as required by law and then take a right onto Nick Martone Road.  Mr. Fusilier stopped at the stop sign and then also took a right onto Nick Martone Road, because that was the road down which he needed to drive in order to get to his home located at 5834 Sohio Road.  Because the white SUV had tinted windows, Mr. Fusilier was not able to see how many people were in the white SUV, or tell anything about who might be in the white SUV, like male or female, white, black, or Hispanic, etc.  Not long after the white SUV turned onto Nick Martone Road, Mr. Fusilier observed the white SUV to begin traveling in the middle of the road and then slowly moving back and

7

forth from one side of the road to another.  Mr. Fusilier became very concerned about the white SUV being driven in such an erratic and unsafe manner and, for this reason, began flashing his high beams, hoping to catch the attention of the driver and, perhaps, wake him/her up.  Also, Mr. Fusilier had white LED security lights attached to the front windshield of his vehicle that he used for work, and he put them on, still trying to get the attention of the driver of the white SUV.  Mr. Fusilier had never seen that vehicle before, and he was concerned about the safety of the driver of that vehicle, as well as the safety of the general public on that road.  The white SUV made a right turn at 6250 Nick Martone Road into a driveway leading to a house, and, because of his concern, Mr. Fusilier followed the white SUV into the driveway and followed it until it stopped so that he could talk to the driver and make sure he/she was okay.  Once he was stopped, Mr. Fusilier, who was wearing jeans, a t-shirt, and a sweat shirt which did not even remotely look like a police uniform, got out of his truck with his cellphone in his left hand.  The person driving the white SUV turned out to be Zaunbrecher, who also got out of her vehicle and approached Mr. Fusilier.  This was the first time that Mr. Fusilier had ever seen Zaunbrecher, he had no idea who she was or that she lived at that location, because he had never seen her or her vehicle before.  When Mr. Fusilier asked Zaunbrecher if she was okay, her angry, indignant reply was, "What you're doing is illegal. You need to get out of my yard", to which Mr. Fusilier responded, "Ma'am, I'm checking on you. Are

8

you okay? Why are you driving like that?", to which she responded by telling him that he was on private property, she worked for the **CPSO**, she was going to "**call it in to the Sheriff's Office**", and that he needed to get off her property, to which Mr. Fusilier responded, "Does that give you an excuse to drive like you're driving?", and then Mr. Fusilier left.  Prior to leaving, Mr. Fusilier took two photos of Zaunbrecher's license plate with his cellphone in order to give the information about Zaunbrecher's erratic driving on Nick Martone Road to the Louisiana State Police, which he did.  During their very brief conversation, Zaunbrecher walked to the back of Mr. Fusilier's truck to get his license plate number, and in doing so, walked twice past Mr. Fusilier in close proximity to him, once walking to Mr. Fusilier's truck and then returning to her own vehicle.

12.    Mr. Fusilier then left as he was ordered by Zaunbrecher to do, then continued down Nick Martone Road in the same direction he had been going and turned left onto Sohio Road to go to the house that he was renting from Mr. Jerry Suire.  The rent house is located on the same property as Mr. Suire's house.  Mr. Fusilier first stopped at Mr. Suire's house to speak to Mr. Suire and to pay Mr. Suire his utility money, because all of the utilities for both Mr. Suire's house and the rent house are on the same account.  While Mr. Fusilier was standing outside and talking to Mr. Suire, Zaunbrecher, who had followed Mr. Fusilier in her vehicle down Nick Martone Road and stopped on the highway in front of Mr. Suire's house, stared at

Mr. Suire and Mr. Fusilier, and then drove off. Sometime while Zaunbrecher was either following or watching Mr. Fusilier, or maybe shortly thereafter, Zaunbrecher used her cellphone to call the CPSO and make a **<u>false complaint</u>** against Mr. Fusilier for criminal trespass and false personation of a peace officer.  Mr. Fusilier then drove to his house where he had a quick bite of lunch, and left to go to one of his son's DARE graduation at 1 o'clock.

**13.**    When Zaunbrecher called the CPSO, she **falsely accused** Mr. Fusilier of the misdemeanor crime of criminal trespass and the felony crime of false personation of a peace officer saying that Mr. Fusilier used a flashing white strobe light mounted in his vehicle to stop Zaunbrecher in her private driveway when Zaunbrecher was driving to her home at the end of her driveway, that Mr. Fusilier then drove down Zaunbrecher's driveway, got out of his vehicle, and flashed what Zaunbrecher described as a "badge", and asked Zaunbrecher why she was driving crazy on the road.  Notwithstanding that the facts stated by Zaunbrecher to the CPSO did not rise to the level of probable cause for either alleged criminal offense, Zaunbrecher's complaint to the CPSO about Mr. Fusilier set in motion a chain of events resulting in great damage to Mr. Fusilier and his family in violation of federal and state law, merely because Zaunbrecher was a Deputy Sheriff with friends who were also Deputy Sheriffs and, thus, working together, had the power to do so.

**14.**    At no time was Mr. Fusilier pretending to be a peace officer or anything that he wasn't.  He did not have any kind of a badge on him, and he did not show Zaunbrecher a badge.  Mr. Fusilier did not tell Zaunbrecher that he was a peace officer, he did not attempt to injure or defraud Zaunbrecher or to obtain or secure any special privilege or advantage from her.  Mr. Fusilier's truck is a 2006 GMC Sierra 1500, and, at that time, it had a Marine Corps plate in the front and a disabled American veteran plate in the back.  On the back windshield of his truck, Mr. Fusilier had Marine Corps stickers which said, "Iraq Veteran", "United States Marine Corps", "Weapons Training Battalion", and "26 Echo Company", as well as a Saints sticker and a little LSU hard figure that is stuck to the glass, all of which clearly demonstrated how proud Mr. Fusilier is to be a United States Marine, as well as a Saints and LSU fan; obviously, there was no way that Mr. Fusilier's truck was a police vehicle, and Zaunbrecher had a clear view of all of the information on Mr. Fusilier's truck, having walked to the back of it to write down Mr. Fusilier's license plate number.

**15.**    Mrs. Fusilier worked at the school where their son's DARE graduation was supposed to be held, so Mrs. Fusilier met Mr. Fusilier in the gym for the graduation. During the DARE graduation, Mr. Fusilier's work phone rang a couple of times, so he turned it off, thinking that it was work calling, in order to enjoy the graduation with his wife.  At the end of the graduation, Mrs. Fusilier's phone had a number of

missed calls from her sister, Kristi.  When Mrs. Fusilier returned Kristi's call, Kristi told Mrs. Fusilier that at least ten cops had just shown up at Mrs. Fusilier's mother's house looking for Mr. Fusilier and that she gave them Mr. Fusilier's phone number, so it was the law enforcement who had called Mr. Fusilier's cellphone during the DARE graduation.  When the graduation was completed, he called the number back, and the person who answered the phone was Corporal Abshire, a Defendant herein, from the CPSO.  Abshire told Mr. Fusilier that Mr. Fusilier needed to go to the CPSO to answer some questions about an ongoing investigation that Abshire had.  Because Abshire was with the CPSO, Mr. Fusilier thought that him being called in had something to do with what happened with Zaunbrecher earlier that day.  Mr. Fusilier then drove directly to the CPSO.  Mr. Fusilier, being a law-abiding citizen who had never been arrested before and knowing that all he had done earlier that day was try to prevent someone from being hurt, voluntarily went to the CPSO, parked in front, and walked through the center door of the main lobby.  There were several Deputy Sheriffs inside, and when Mr. Fusilier asked, "Is there a Corporal Abshire in here?", about four or five deputies swarmed around him.  As required of a person with a concealed weapon permit, Mr. Fusilier immediately told the deputies that he had a weapon on him and a permit for it.  They checked all of his pockets and everything to make sure he did not have anything else on him, handcuffed him, and then put him in a holding cell.  The concealed weapon that Mr. Fusilier was carrying was a

Walther PPS 40 Caliber on his hip.  Mr. Fusilier also had in the glove box of his truck a Sig Sauer, which was a company weapon that he used for work.  Initially, Mr. Fusilier was questioned about whether or not he had actually been in the Marine Corps or was a Marine, insinuating that Mr. Fusilier had not been in the Marine Corps.  Then, the Lieutenant on duty asked Mr. Fusilier, "Do you know who you pulled over?", to which Mr. Fusilier responded, "I didn't pull anybody over, sir, I was checking on somebody."  Then the deputy threatened Mr. Fusilier by saying, "You messed with the wrong people."  Subsequently, because he had nothing to hide, Mr. Fusilier gave permission to search his vehicle, his cellphone, and the company cellphone, as well as his house, all of which were searched.  Mr. Fusilier was then taken from the holding cell to another room not too far away where he encountered Trosclair, and Mr. Fusilier was patted down again and advised of his rights.  At that point, Mr. Fusilier knew that the deputies had it in their minds from the get go that he, Mr. Fusilier, was going to go to jail, and, in fact, they even told him that, so he told them that he was going to exercise his Fifth Amendment right and not talk to them anymore and requested an attorney be present before he did anything further.  Obviously, the deputies knew that Mr. Fusilier was not going to be able to bond out and go home, because Abshire called Mrs. Fusilier and told her to come get Mr. Fusilier's pickup truck.  No badge of any kind was found in the search of Mr. Fusilier's person, vehicle, or home, because he never had a badge in

the first place. At some point, Trosclair ordered Mr. Fusilier to delete the two pictures he had taken of Zaunbrecher's license plate from his cellphone.

16. Unknown to Mr. Fusilier, while he was attending his son's DARE graduation ceremony, Abshire, in the company of five to ten police officers or Deputy Sheriffs in numerous cars, went to Mr. Fusilier's mother-in-law's house at 101 Yvette Street, in Iowa, LA, demanding to find out where Mr. Fusilier was. Mr. Fusilier's sister-in-law Kristi was standing out front of the house when Abshire drove up in front of her at a very high rate of speed, slammed on his brakes, and stopped so short from her that she stepped back out of fear of being hit. When Abshire got out of his patrol unit, he had his hand on his firearm, which he kept there the whole time he was talking to her. Abshire refused to tell Kristi what Mr. Fusilier was wanted for, but Abshire was acting as if Mr. Fusilier was some type of dangerous criminal. Upon information and belief, there were officers there from CPSO, Iowa, LA, Police Department, as well as maybe the LA State Police. Anyone seeing such a scene would think that the police were after some seriously dangerous person.

17. Mr. Fusilier was formally arrested for two crimes he had not committed, to-wit: Criminal trespass, La. R.S. 14:63, a misdemeanor; and False personation of a peace officer or firefighter, La. R.S. 14:112.1, a felony. The District Attorney's Office refused the charge of criminal trespass but accepted the charge of false personation of a peace officer or firefighter, for which Mr. Fusilier had a jury trial

on September 22nd and 23rd, 2016, in which, after deliberating for only 27 minutes, the unanimous jury returned a verdict of not guilty.

18.    After meeting with Mr. Fusilier as stated in Paragraph 15, *supra*, Trosclair returned to his office and personally prepared an Affidavit for Arrest Warrant for a "48 Hour Warrant", an Arrest Warrant, and a Bail Order for Mr. Fusilier for criminal trespass and false personation of a peace officer.

As a result of those documents, Mr. Fusilier was not able to bond out of the Calcasieu Parish Correctional Center for 29 days until February 2, 2016, as a result of which, *inter alia*, he lost his job, was evicted from his home in which he lived with his wife and three children, and was damaged as described herein.

19.    The Affidavit Trosclair wrote for the 48 Hour Arrest Warrant statement of "probable cause" was:

> Subject Dameon Fuseiler [*sic*] used a flashing white strobe light mounted in his vehicle to stop an off duty Calcasieu Parish Sheriff's Office Deputy in her private driveway. Fuselier [*sic*] drove down the victims driveway and upon exiting his vehicle flashed what the victim with law enforcement experience described as a badge. Fuselier [*sic*] asked the victim why she was driving crazy on the road. The victim lives approximately one mile from the subject Fuselier [*sic*].

Trosclair's statement of "probable cause" did not state probable cause to arrest Mr. Fusilier for either criminal trespass or false personation of a peace officer. La. R.S. 14:112.1, False personation of a peace officer or firefighter, states, in pertinent part:

15

A. False personation of a peace officer or firefighter is the performance of any one or more of the **following acts with the intent to injure or defraud or to obtain or secure any special privilege or advantage**:
(1) Impersonating any peace officer or firefighter or assuming, without authority, any uniform or badge by which a peace officer or firefighter is lawfully distinguished.
(2) Performing any act purporting to be official in such assumed character.
(3) Making, altering, possession, or use of a false document or document containing false statements which purports to be a training program certificate or in-service training certificate or other documentation issued by the Council on Peace Officer Standards and Training, pursuant to R.S. 40:2405, which certifies the peace officer has successfully completed the requirements necessary to exercise his authority as a peace officer.
(4) Equipping any motor vehicle with lights or sirens which simulate a law enforcement vehicle. [*Emphasis added*]

Clearly, Trosclair's "probable cause" does not demonstrate probable cause for La. R.S. 14:112.1A., because there are absolutely no facts indicating that, whatever Mr. Fusilier did, he did so "with the intent to injure or defraud or to obtain or secure any special privilege or advantage." Therefore, whatever Zaunbrecher said Mr. Fusilier did or Trosclair put in his "probable cause" statement, Mr. Fusilier clearly did not violate La. R.S. 14:112.1. La. R.S. 14:63, Criminal trespass, states, in part, as follows:

B. (1) No person shall enter upon immovable property owned by another without express, legal, or implied authorization.
…
D. It shall be an affirmative defense to a prosecution for a violation of Subsection A, B, or C of this Section, that the accused had express,

16

legal, or implied authority to be in the movable or on the immovable property.

Certainly, Mr. Fusilier was acting in the capacity of a Good Samaritan, trying to either help somebody who might be in distress or to stop that somebody from hurting somebody else by driving erratically on the highway.  Clearly, Mr. Fusilier, like any other person, had the implied authority to drive onto Zaunbrecher's property for the limited purpose for which he did so.  In addition, the District Attorney's Office refused to accept the charge of criminal trespass.  In addition to unlawfully seizing and falsely arresting Mr. Fusilier, Trosclair violated Mr. Fusilier's Eighth Amendment right to bond, as well as Article I § Section 18, of the Louisiana Constitution of 1974 and Louisiana Code of Criminal Procedure Article 330, both of which state that, before and during trial, a person shall be bailable by sufficient surety, however, persons charged with crimes of violence or drug violations can be denied bail if, after a contradictory hearing, a judge or magistrate finds by clear and convincing evidence that there is a substantial risk that the person may flee or poses an imminent danger to another person or the community.  **Mr. Fusilier did not have any contradictory hearing.**  Trosclair, in preparing the Arrest Warrant based upon Trosclair's Affidavit, filled in for the bond amount for false personation of a peace officer, Amount "$0.00", Description "Hold without bond", and for the criminal trespass charge, Amount "$5,000.00", in violation of the pre-set misdemeanor bonds

17

schedule approved by all of the 14th Judicial District Court Judges on June 28, 2012, in which the bond amount for criminal trespass is $500.00.

20.   Because of his recent December 26, 2015, gallbladder removal, Mr. Fusilier's 29-day incarceration in the Calcasieu Correctional Center was a living hell.  The hardest part on Mr. Fusilier was not having a bond set, not knowing when he would get out of jail, and not knowing when he would be back with his family.  In addition, Mr. Fusilier was recovering from gallbladder surgery for which he did not receive proper nutrition and electrolytes like Gatorade or Powerade, which made it even worse.  Because Mr. Fusilier was not able to have Gatorade or Powerade to keep him hydrated and to replace the supplements that his body needed because of his extreme number of bowel movements, as well as Mr. Fusilier's loss of appetite because of the surgery healing process, he lost 25 pounds while he was in jail for 29 days.  Mr. Fusilier was not given pain medications or sleep medication, so he was in constant pain and not able to sleep.  Mr. Fusilier has had problems sleeping since his combat missions in the Marine Corps for which he had been prescribed Ambien in order to help him sleep.  Also, sleeping on a metal bed with a one-inch thick mattress did not help his wounds from his surgery.  In addition to the pain and discomfort from the surgery, he was having ten or more bowel movements a day because of the surgery.  Mr. Fusilier was given only one roll of toilet paper a week, even though the guards knew that he had surgery and was in distress.  Mr. Fusilier would ask and

18

ask for more toilet paper, and the jailers would just ignore him, so Mr. Fusilier had to end up begging other inmates for their toilet paper. When Mr. Fusilier would get visitations from his wife and one of his children, it was extremely stressful. Every time he spoke to his son, the son would start crying and that would make Mr. Fusilier cry. It was unexplainable in words how Mr. Fusilier felt about having his wife and child seeing him in jail, behind glass, when he knew he had done nothing wrong. For Mr. Fusilier, it was a very scary, emotional, overwhelming experience being in jail for something he did not do. His 29 days in jail clearly exacerbated Mr. Fusilier's PTSD, as a result of which the V.A. increased his military service-connected disability rating from 80% to 100%.

21.    Mr. Fusilier's 29-day incarceration created hell for his family and turned their world upside down. Little did Mrs. Fusilier know that was the last time she would be able to kiss her husband for 29 days. While driving her husband's truck home, Mrs. Fusilier broke down and cried her eyes out before seeing her children. Of course, the children were extremely upset about this. Because of Mr. Fusilier's 29-day incarceration, he was not able to pay the rent for his house, and he and his family were evicted and had to move in with Mrs. Fusilier's parents. Mr. Fusilier also lost his job, and, because of the loss of income, they literally ended up having to go to a food bank for food and borrow money from family and friends, which was devastating to them and almost more than Mr. Fusilier could take. Mr. Fusilier got

his first job at the age of 15.  He loved to work, and he loved the job he had, because it almost made him whole again as a person.  Losing that job destroyed his world, resulting in his inability to sleep, depression, and exacerbation of his PTSD, all of which resulted in the increased disability rating by the V.A.

22.     The only reason why Mr. Fusilier got out of jail before trial was that he hired an attorney and filed a Habeas Corpus Motion, as the result of which on February 3, 2016, a bond of $30,000.00 was set for the false personation charge, but, in addition to that, the court ordered a Louisiana Uniform Abuse Prevention Order, which was not even applicable to Mr. Fusilier's case because those Orders are for domestic violence situations, which, clearly, this case was not.  However, as a result of that Order, Mr. Fusilier was required to wear a GPS bracelet for many months at the cost of about $400.00 a month and was prohibited from possessing a firearm, which meant that, even if Mr. Fusilier had not been terminated by his employer because of his arrest for false personation, Mr. Fusilier would have been unable to perform his job, because his job required that he carry a firearm.

## THEORIES OF RECOVERY

### Federal Law Claims Under 42 U.S.C. § 1983

23.     Zaunbrecher, Trosclair, Abshire, and Shelton, individually and in conspiracy with each other, and acting under color of state law, did violate Mr. Fusilier's Fourth Amendment right to be free from the unreasonable seizure of his person and

malicious prosecution on the false personation of a peace officer charge and Mr. Fusilier's Fourteenth Amendment right to due process by causing his unlawful seizure on the false personation of a peace officer charge. Zaunbrecher, Trosclair, Abshire, and Shelton caused Mr. Fusilier's arrest without probable cause and caused the commencement and continuation of the prosecution of the criminal charge against Mr. Fusilier. Mr. Fusilier was tried and found not guilty, thus, there has been a *bona fide* termination in favor of Mr. Fusilier, no probable cause existed for the prosecution of Mr. Fusilier on the charge, they acted with malice in causing the commencement and continuation of the prosecution, and the prosecution caused damages to Mr. Fusilier as more fully set forth herein. They are liable to Mr. Fusilier for this conduct pursuant to 42 U.S.C. § 1983.

24. Zaunbrecher, Trosclair, Abshire, and Shelton, individually and in conspiracy with each other, and acting under color of state law, did violate Mr. Fusilier's Eighth Amendment right to reasonable bail by causing Mr. Fusilier to be denied bail on the false personation of a peace officer charge and by having the bail for criminal trespass set at $5,000.00, which is ten times the amount required in the court-ordered misdemeanor pre-set bonds schedule, as well as requiring a GPS tracking bracelet for many months. They are liable to Mr. Fusilier for this conduct pursuant to 42 U.S.C. § 1983.

### *Violations of the Louisiana Constitution*

25.    The offenses and actions of Zaunbrecher, Trosclair, Abshire, and Shelton as described above violate the civil rights guaranteed Mr. Fusilier under the Louisiana Constitution, Article I §§ 2, 3, 5, 7, and 18, protecting citizens from deprivation of liberty without due process of law, ensuring equal protection under the law, and the right to bail.

### *Claims Under Louisiana Law for Negligence and/or Intentional Tort*

26.    The actions or omissions of Zaunbrecher, Trosclair, Abshire, and Shelton were unreasonable, below the duty of care ordinarily exercised by reasonably prudent persons, and cause-in-fact of the damages complained of herein, all of which were reasonably foreseeable under the circumstances and which constituted risks within the duty contemplated.

27.    For the conduct alleged in this Complaint, Zaunbrecher, Trosclair, Abshire, and Shelton are liable to Mr. Fusilier for the Louisiana torts of false arrest, false imprisonment, battery, defamation, malicious prosecution, and denial of bail on the false personation of a peace officer charge, for the reasons stated in Paragraphs 23 and 24, *supra*.

28.    For causing articles to appear in the local newspaper, the KATC website, and on television, which can still be found on the internet, containing false allegations of criminal acts committed by Mr. Fusilier to be published, Zaunbrecher, Trosclair,

Abshire, and Shelton are liable to Mr. Fusilier for the Louisiana tort of defamation, in that they:

(a)     Knowingly made false statements concerning Mr. Fusilier;

(b)     Published those statements to a third-party through a non-privileged communication;

(c)     Made those communications through intentional and negligent actions and inactions constituting legal fault on their part, and;

(d)     The communications caused injury to Mr. Fusilier, all as more fully set forth below.

29.     At all times relevant herein, Mancuso, in his official capacity as the Sheriff of Calcasieu Parish, was the employer of Zaunbrecher, Trosclair, Abshire, and Shelton and either controlled or had the ability to control their actions. Mancuso is liable to all Plaintiffs for the actions that Zaunbrecher, Trosclair, Abshire, and Shelton committed during the course and scope of their employment with the CPSO and any damages resulting therefrom and, as set forth herein, under the doctrine of *respondeat superior*.

30.     ABC INSURANCE CO. is sued herein pursuant to the Louisiana Direct Action Statute, La. R.S. 22:1269(B)(2), as it provided a policy of insurance to Mancuso and/or the CPSO that provides insurance coverage for the acts complained of herein.

### Claims of Kayla Lynn Fusilier, D. Deshotel, H. Fusilier, and Ryan S. Benoit

31.     As a result of the tortious actions of Zaunbrecher, Trosclair, Abshire, and Shelton, as described *supra*, these Plaintiffs were deprived of the consortium of their husband and father.  Zaunbrecher, Trosclair, Abshire, and Shelton are liable to Kayla Lynn Fusilier, D. Deshotel, H. Fusilier, and Ryan S. Benoit for loss of consortium under state law.

## DAMAGES

### Federal Causes of Action

32.     For his federal causes of action, Mr. Fusilier has suffered significant compensatory damages because of the actions of all Defendants for which he is entitled to recover an amount of money reasonable in the premises.  As a result of the actions of the Defendants, Mr. Fusilier has suffered a loss of freedom and liberty, physical pain and suffering, emotional distress and mental anguish, loss of enjoyment of life, lost wages, lost earning capacity, humiliation and embarrassment, loss of reputation, the cost of a criminal defense attorney, and other losses that will be proven at the trial of this matter.

33.     Because the actions of Zaunbrecher, Trosclair, Abshire, and Shelton were in reckless and callous indifference to Mr. Fusilier's constitutional rights, Mr. Fusilier is entitled to recover punitive damages from Zaunbrecher, Trosclair, Abshire, and Shelton in an amount reasonable in the premises.

**34.**    Mr. Fusilier is entitled to interest from the date of judicial demand, court costs, and attorney's fees.

### *Louisiana Causes of Action*

**35.**    For his state causes of action, Mr. Fusilier has suffered significant compensatory damages because of the actions of all Defendants for which he is entitled to recover an amount of money reasonable in the premises.  As a result of the actions of the Defendants, Mr. Fusilier has suffered a loss of freedom and liberty, physical pain and suffering, emotional distress and mental anguish, loss of enjoyment of life, lost wages, lost earning capacity, humiliation and embarrassment, loss of reputation, the cost of a criminal defense attorney, and other losses that will be proven at the trial of this matter.

**36.**    Mrs. Fusilier, individually and on behalf of her minor children, D. Deshotel and H. Fusilier, and Ryan S. Benoit have suffered significant compensatory damages because of the actions of all Defendants, for which they are entitled to recover an amount of money reasonable in the premises.  As a result of the actions of the Defendants, Mrs. Fusilier, individually and on behalf of her minor children, D. Deshotel and H. Fusilier, and Ryan S. Benoit have all suffered a loss of love and affection, loss of society and companionship, loss of performance of material services, loss of financial support, and loss of aid and assistance.  Mrs. Fusilier has also suffered impairment of sexual relations.

25

## JURY DEMAND

**37.** The Plaintiffs demand a jury trial on all issues for which they are entitled to a trial by jury in this case.

## PRAYER

For the harm caused by the conduct of Defendants, Plaintiffs pray that, after due proceedings had, there be judgment in Plaintiffs' favor finding Defendants, jointly and severally, liable to the Plaintiffs for compensatory damages, punitive damages, attorney's fees, costs, interest, and any and all legal and/or equitable relief this Court deems proper, as well as a trial by jury.

Respectfully submitted,

**THE GOODE LAW FIRM, A P.L.C.**
812 Johnson Street
P. O. Box 3366
Lafayette, LA 70502-3366
Telephone (337) 234-0600

s/ William L. Goode

BY: _____

**WILLIAM L. GOODE (#6128)**
Counsel for Plaintiffs, DAMEON R. FUSILIER and KAYLA LYNN FUSILIER, Individually and on Behalf of her Minor Children, D. DESHOTEL and H. FUSILIER, and RYAN S. BENOIT

26